IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| RICHARD GILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL NO. 3:11cv85-HEH |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Richard Gill ("Plaintiff") worked exclusively as an airline pilot from 1987 to 2002. He

suffered a heart attack in September 2002 and a disc rupture in July 2004.[1] Plaintiff had back

surgery in 2005 and was unable to return to work as an airline pilot due to his back pain

medications. However, he did not apply for Social Security Disability ("DIB") until May 1,

2007, claiming that the frequency and severity of his back pain rendered him "disabled" under

the Social Security Act (the "Act"). This claim was denied by an administrative law judge

("ALJ"), who found that Plaintiff was "not disabled" as of that date. That decision was based in

part on a finding that, under the Medical-Vocational Guidelines ("Grid") Rule 202.14, Plaintiff

---

[1] In his motion for summary judgment, Defendant thoroughly details the history of
Plaintiff's cardiac impairment and treatment, concluding that his condition was stable. (Def.'s
Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 2-6.) In his reply brief, Plaintiff
readily concedes this fact, noting that while cardiovascular disease has precluded him from
returning to work as an airline pilot, it is not a material fact affecting his RFC assessment. (Pl.'s
Reply to Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Pl.'s Reply") at 1-2.) This Court
therefore confines its discussion of Plaintiff's medical history to the salient issue, namely,
Plaintiff's back impairment.

was fifty-three (53) years old with a residual functional capacity ("RFC") to perform nearly the full range of light work.[2] (R. at 18.)

Plaintiff alleges that the ALJ erred in making this RFC determination by failing to give controlling weight to the opinion of Plaintiff's treating physician, Kenneth Simpson, M.D. ("Dr. Simpson"). In contrast with the ALJ's RFC determination, Dr. Simpson opined that Plaintiff had a RFC to perform only sedentary work.[3] (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 9-12.) Plaintiff is currently receiving benefits to which he became entitled on July 31, 2008, when, on his fifty-fifth birthday, Plaintiff's age category automatically qualified him for benefits under the Grid Rules.[4] (R. at 22-23.) Had the ALJ concurred with Dr. Simpson that Plaintiff had an RFC to perform only sedentary work as of the alleged onset date, Plaintiff would have been eligible for DIB as of May 1, 2007, rather than July 31, 2008, entitling him to more than one year of additional benefits.

---

[2] Under the Code of Federal Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

[3] Under the Code of Federal Regulations, "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[4] Pursuant to the Code of Federal Regulations, a person attains a given age on the first moment of the day preceding the anniversary of his birth corresponding to such age. Plaintiff's birthday is August 1, 2008. Therefore, he attained age fifty-five (55) on July 31, 2008. 20 C.F.R. § 404.2(c)(4).

Plaintiff now challenges the ALJ's decision in this Court, seeking judicial review pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment which are now ripe for review.[5] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF No. 7) be DENIED; that Defendant's motion for summary judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. MEDICAL HISTORY

Plaintiff alleges that his ongoing musculoskeletal impairment prevents him from performing the walking, standing, and lifting requirements for a "light work" RFC. (Pl.'s Reply at 2.) Specifically, Plaintiff assigns error to the ALJ's assessment of the medical record and physician opinions regarding his vocational limitations due to his physical impairments. For this reason, Plaintiff's musculoskeletal treatment history is of particular relevance.

**A.     Treatment History with Dr. Mehta**

In August of 2005, Plaintiff saw Rajesh Mehta, M.D. ("Dr. Mehta") regarding his back and left leg pain. (R. at 209-10, 367-68.) Plaintiff reported that he had experienced back pain for several years, but that it first became unmanageable in July 2005, after an incident in which his

---

[5] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

dog jumped on him. (R. at 209.) Dr. Mehta informed Plaintiff that he was a good candidate for a lumbar discectomy,[6] but that a more conservative treatment — epidural steroid injections[7] — should be pursued first. (R. at 212-15, 367-68, 443, 444, 446.) Plaintiff agreed to pursue the more conservative course of treatment. However, he returned to Dr. Mehta one month later — unsatisfied with the results from the epidural steroid injections — to proceed with the lumbar discectomy. (R. at 366.) Dr. Mehta performed the discectomy on September 27, 2005. (R. at 362-63.)

A month after the discectomy, Dr. Mehta followed up with Plaintiff, who reported significant improvement in his condition — he was virtually "pain free." (R. at 364.) However, in December of 2005, Plaintiff again returned to Dr. Mehta, reporting some back pain. (R. at 361.) Dr. Mehta believed that the pain was caused by a weak disc and informed Plaintiff that it would heal over time with the help of physical therapy and anti-inflammatories. (R. at 361.) Plaintiff subsequently began physical therapy, and by March 2006, he had achieved all of his physical therapy goals. (R. at 225-30, 439.) Dr. Mehta did not see Plaintiff again until July 2007, at which time Plaintiff complained of back pain coupled with right leg pain. (R. at 360.) Despite the returning pain, Dr. Mehta reported that the back surgery had "helped exceptionally well." (R. at 360.)

Approximately one year following the surgery, Plaintiff began to experience stiffness and soreness, including pain in his right leg that radiated into his thighs and buttocks. (R. at 360.)

---

[6] Discectomy is the "excision of an intervertebral disc." *Dorland's Illustrated Medical Dictionary* 547 (31st ed. 2007) [hereinafter *Dorland's*]. Intervertebral means "between two contiguous vertebrae." *Id.* at 952.

[7] Epidural means "situated outside or upon the dura mater." *Id.* at 632. Dura mater means "the outermost, toughest, most fibrous of the three membranes covering the brain and spinal cord." *Id.* at 573.

Dr. Mehta's examination revealed that Plaintiff had a "difficult gait"[8] and "paraspinal muscle spasming."[9]  (R. at 616.)  Dr. Mehta ordered an MRI three weeks later which revealed "edema[10] in the endplates[11] and some retrolisthesis[12] on the x-rays," but no evidence of recurrent or residual disc protrusion,[13] which would have accounted for Plaintiff's pain.  (R. at 357-58, 360, 615.)  Because Dr. Mehta could not locate the cause of the pain, he believed that surgery was not warranted at that time, and instead referred Plaintiff to Peter Crane, M.D. ("Dr. Crane"), a pain management specialist.  (R. at 356.)

**B.     Treatment History with Dr. Crane**

Dr. Crane conducted an initial evaluation of Plaintiff on July 24, 2007.  (R. at 382.)  At that time, Plaintiff reported that he had experienced progressively worse back and leg pain over the past several months.  (R. at 382.)  The physical examination revealed that Plaintiff retained full muscle power, normal muscle bulk and tone, intact sensation, and full extremity range of motion with no signs of inflammation.  (R. at 383.)  However, Dr. Crane did discover an antalgic

---

[3] Gait means "the manner or style of walking." *Id.* at 753.

[9] Paraspinal means "near the spine." *Id.* at 1381.

[10] Edema means "the presence of abnormally large amounts of fluid in the intercellular tissue of the body." *Id.* at 593.

[11] Endplate means "the discoid expansion of a terminal branch of the axon of a motor nerve fiber, which opposes the subneural apparatus of a skeletal muscle fiber, forming the neuromuscular junction." *Id.* at 621.

[12] Retrolithesis means "posterior displacement of one vertebral body on the subjacent body." *Id.* at 1636.

[13] Residual disc protrusion means "the herniation of a [remaining] intervertebral disc." *Id.* at 1538, 1627.

gait, which he twice treated during the month of August 2007, through the administration of diagnostic medial branch blocks.[14] (R. at 373-74, 383-84, 597-98.)

At a September 17, 2007 follow-up appointment, Plaintiff reported a thirty-five (35%) percent improvement in his overall activity level. (R. at 595, 658.) His waist extension and twisting abilities had improved and he had decreased his medication usage. (R. at 595, 658.) He rated his pain a five (5) on a scale from one (1) to ten (10). (R. at 658.) Dr. Crane's physical examination was consistent with Plaintiff's report — Plaintiff had improved back range of motion, minor muscle spasm, and full (5/5) motor strength. (R. at 595.) Dr. Crane recommended additional medial branch blocks, because Plaintiff had responded so positively to the first round of treatment. (R. at 596.) Plaintiff saw Dr. Crane again in November 2007 after having undergone radiofrequency ablation[15] of the left lumbar medial branch nerves. (R. at 656.)

While he reported some remaining intermittent pain, overall, Plaintiff experienced "substantial improvement." (R. at 656.) He returned to Dr. Crane one month later for a follow-up appointment, at which time he reported a different type of pain. Accordingly, Dr. Crane increased Plaintiff's hydrocodone dose and began a trial of methadone. (R. at 654-55.) In January 2008, Plaintiff reported eighty (80%) percent pain relief from the medication, and also stated that he was more active, sleeping less at night, and, not napping during the day. (R. at 652.) At that time, Plaintiff stated that his pain ranked one (1) on a scale from one (1) to ten (10). (R. at 652.)

---

[14] Medial branch block means "regional anesthesia of part of the cervical region of the back, produced by an injection of a local anesthetic around a medial branch of or branches of a posterior branch of a cervical nerve." *Id.* at 227.

[15] Radiofrequency ablation means "the destruction of precisely controlled areas of tissue by heat induced by low-frequency electromagnetic waves." *Id.* at 4.

Dr. Crane did not see Plaintiff again until March 2008. (R. at 650.) At that appointment, Plaintiff reported continued lower back pain, although he also stated that the methadone was providing substantial improvement. (R. at 650.) Dr. Crane noted that what Plaintiff considered "substantial improvement" was "getting out of bed and going to the mailbox." (R. at 650.) Despite this caveat, Dr. Crane noted that, overall, Plaintiff's condition had improved and he had become more functional. (R. at 650.) A month later, Plaintiff reported that his pain ranked a three (3) on a scale from one (1) to ten (10) and that the medication was providing marked relief. (R. at 648.)

At a June 2008 appointment, however, Plaintiff reported that he had experienced more profound back pain over the prior twenty (20) days. (R. at 646.) Dr. Crane recommended a repeat radiofrequency ablation on the left, which was performed in July, and advised Plaintiff to continue taking his pain medications as prescribed. (R. at 642-43, 647.) In August of that same year, Dr. Crane performed a radiofrequency ablation on the right lower lumbar facet joints. (R. at 640.) By September 2008, Plaintiff was reporting "substantial improvement" — his mobility had improved and he was taking less medication. (R. at 638.)

C.    **Dr. Simpson Treatment History**

In addition to Dr. Crane, Plaintiff has also received "consistent treatment" for his back impairments from his family physician, Dr. Simpson. (Pl.'s Mem. at 3.) The medical evidence on record from Dr. Simpson contains a copy of Plaintiff's July 8, 2005 MRI results, revealing evidence of degenerative disc disease. (R. at 351.) The only other evidence of Dr. Simpson's treatment of Plaintiff's back impairment are the range of motion, neurological assessment, and Physical Residual Capacity Assessment forms. These forms were completed in September 2008 at Plaintiff's request. (R. at 631, 633-37.) In these forms, Dr. Simpson opined that Plaintiff was

7

incapable of performing even sedentary basic work activities for an eight-hour day. (R. at 633-37.)

In the range of motion form, Dr. Simpson indicated that Plaintiff's range of motion in the cervical and lumbar spine was limited and that the lumbar spine contained sensory deficits. (R. at 635.) His neurological assessment revealed almost full (5/5) strength in both the upper and lower extremities. (R. at 636.) Plaintiff's coordination, gait, and station, however, were abnormal in almost all categories. (R. at 636.) Finally, Plaintiff's reflexes were normal in the upper extremities, but depressed in the lower extremities. (R. at 636.)

In completing the Physical Residual Capacity Assessment, Dr. Simpson indicated that Plaintiff could: sit for thirty (30) minutes, stand for ten (10) minutes, and walk for ten (10) minutes continuously in an eight-hour workday without changing positions. (R. at 633.) Additionally, he found that Plaintiff could lift zero to five (0 – 5) pounds frequently and six to ten (6 – 10) pounds occasionally over the course of an eight-hour day. (R. at 633.) Dr. Simpson reported that, in his opinion, Plaintiff was not capable of performing even low-stress jobs, that Plaintiff's condition was worsening, and that Plaintiff's symptoms were "moderately severe" on medication. (R. at 633.) However, in the same form, Plaintiff stated that he could: sit for fifteen (15) minutes to one (1) hour continuously, stand for twenty (20) minutes continuously, and lift seven (7) pounds occasionally and five (5) pounds frequently. (R. at 633-34.)

**D.      Opinion of Dr. Constant**

On October 10, 2007, Tony Constant, M.D. ("Dr. Constant"), a state agency physician, also assessed Plaintiff's RFC, although he did not personally examine him. (R. at 448-53.) Based on Dr. Constant's review of the entire medical record, including the abovementioned treatment history, he concluded that Plaintiff had an RFC to perform light work that never

8

required climbing ladders, ropes, or scaffolds. (R. at 449-50.) Specifically, Dr. Constant found that, based on the evidence, Plaintiff had no exertional limitations: he could occasionally lift twenty (20) pounds and frequently lift ten (10) pounds; he could stand, sit, and walk about six (6) hours in an eight-hour day; and, he retained the unlimited ability to push and pull objects. (R. at 449.) Furthermore, Dr. Constant concluded that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 450-51.) Dr. Constant further opined that Plaintiff's statements regarding his limitations were only "partially credible." (R. at 453.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on September 4, 2007, claiming disability due to heart failure and degenerative disc disease,[16] with an alleged onset date of May 1, 2007. (R. at 87-93, 103.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[17] (R. at 59-63, 65-70.) On October 16, 2008, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 24-56.) On March 19, 2009, the ALJ issued a decision finding that Plaintiff's disability did not commence until July 31, 2008.[18] (R. at 10-23.) The Appeals

---

[16] "Degenerative disc disease is not really a disease but a term used to describe the normal changes in [one's] spinal discs [due to] age. Degenerative disc disease can take place throughout the spine, but it most often occurs in the discs in the lower back (lumbar region) and the neck (cervical region)." *Degenerative Disc Disease-Topic Overview*, WebMD.com, http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview (last visited Feb. 21, 2012).

[17] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

[18] Plaintiff was fifty-three (53) years old on the alleged onset date of disability. This is defined in the regulations as an individual closely approaching advanced age. On July 31, 2008, Plaintiff first attained age fifty-five (55) under the regulations. *See* 20 C.F.R. § 404.2(c)(4). This changed his age category to an individual of advanced age, automatically resulting in the

Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-5.)

### III.  QUESTION PRESENTED

Is the Commissioner's decision that Plaintiff is not entitled to benefits before July 31, 2008 supported by substantial evidence on the record and the application of the correct legal standard?

### IV.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589).  In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly

---

application of Grid Rule 202.06, and a finding of "disabled." As a result, he was entitled to benefits at that point in time.

detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[19] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of

---

[19] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[20] based on an assessment of the claimant's residual functional capacity ("RFC")[21] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

---

[20] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[21] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Bowen*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of his disability. (R. at 17.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease of the lumbosacral spine with lumbar facet arthropathy,[22] and coronary artery disease with a history of two-vessel bypass surgery and a

---

[22] Facet arthropathy, also known as osteoarthritis is "a type of spondylarthritis (arthritis of the spine) centered in the facet joints, with disc degeneration and pain; it is most common in the lumbar (lower back) region and also occurs in the cervical (neck) region." *Dorland's, supra* note 6, at 158, 668, 1706, 1344, 1753.

myocardial infarction,[23] but that these impairments did not meet or equal any listing in 20 C.F.R. pt. 404, subpt. P, app. 1, as required for the award of benefits at that stage. (R. at 17-18.) The ALJ next determined that Plaintiff had the RFC to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b), except that he must not climb ladders, ropes or scaffolds, and can only occasionally climb stairs. (R. at 18-22.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform his past relevant work because, pursuant to the Federal Aviation Administration regulations, he cannot maintain his pilot's license due to his medications. (R. at 22.) At step five, after considering Plaintiff's age, education, work experience, and RFC, the ALJ nevertheless found that there are other occupations which exist in significant numbers in the national economy that Plaintiff could have performed. (R. at 22-23.) Accordingly, the ALJ concluded that Plaintiff was not disabled as of May 1, 2007, and was employable such that he was not entitled to benefits as of that date. (R. at 22-23.) The ALJ then determined that on July 31, 2008, when Plaintiff first attained age fifty-five (55), his age category changed to an individual of advanced age, automatically resulting in the application of Grid Rule 202.06. As a result, he was entitled to benefits at that point in time. (R. at 23.)

The issue raised in this appeal, therefore, is not whether Plaintiff is entitled to these benefits. He is and has been receiving them since July 31, 2008. Arguing that he was disabled as of the earlier date, Plaintiff seeks reversal and remand for a retroactive award of benefits going back to May 1, 2007. (Pl.'s Mem. at 1.) In support of his position, Plaintiff argues that the

---

[23] Myocardial infarction means "infarction occurring during the period when circulation to a region of the heart is obstructed and necrosis is occurring; it is usually characterized by severe pain, frequently associated with pallor, perspiration, nausea, dyspnea, and dizziness." *Id.* at 934. Necrosis means "the sum of morphological changes indicative of cell death and caused by the progressive degradative actions of enzymes." *Id.* at 1235.

ALJ's finding that Plaintiff is capable of performing the full range of light work is not supported by substantial evidence and fails to apply the correct legal standards. (Pl.'s Mem. at 9-19.) Defendant argues in opposition that the Commissioner's final determination is supported by substantial evidence and application of the correct legal standard such that it should be affirmed. (Def.'s Mem. at 10-15.)

More specifically, Plaintiff contends that the ALJ "assigned Dr. Simpson's opinion 'limited weight' without ever describing what that term means." (Pl.'s Mem. at 10.) He argues that it is "unclear" how Dr. Simpson's assessment falls short of meeting the requirements so as to lend his opinion controlling weight in accordance with the "Treating Physician Rule." (Pl.'s Mem. at 10-11.) Plaintiff further argues that, in applying the correct legal standards, there is "no support for the ALJ's conclusion that Dr. Simpson's opinions are contradicted by, or in conflict with, other substantial evidence of record." (Pl.'s Mem. at 10-11.) Finally, Plaintiff contends that the objective medical evidence of record and his own subjective complaints of pain are consistent with Dr. Simpson's opinion. (Pl.'s Mem. at 23-25.)

## A.      The ALJ properly assessed Plaintiff's treating physician's opinion.

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.

*See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques; and, (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. § 404.1527(d)(3)-(4), (e).

Plaintiff relies on *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987), to support his argument that the ALJ improperly assessed his treating physician's opinion. The court in *Coffman* stated that "a treating physician's opinion is ignored *only* if there is persuasive contradictory evidence." *Id.* at 518 (quoting *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986) (emphasis in original)). Plaintiff overstates the rule. While the ALJ must generally give more weight to a treating physician's opinion, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993, F.2d 31, 35 (4th Cir. 1992)). Since its decision in *Hunter*, the Fourth Circuit has consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded

16

significantly less weight." *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2) .

In this case, the ALJ found that persuasive evidence existed to contradict Dr. Simpson's opinion that Plaintiff was capable of performing less than the full range of sedentary work. While the ALJ did not entirely disregard Dr. Simpson's opinion, the opinion was given "limited weight," because it was inconsistent with "the objective findings of treating physicians and specialists Drs. Kundar, Mehta and Crane, the nature of the claimant's medical care, the State agency medical assessment, and [Plaintiff's] admitted activities of daily living despite his cardiovascular and musculoskeletal impairments."[24] (R. at 21-22.)

At the outset, it is not clear from the record that Plaintiff truly received "consistent treatment" from Dr. Simpson for his back impairment during the relevant time period. (Pl.'s Mem. at 3.) The only medical treatment history from Dr. Simpson contained in the record includes a copy of Plaintiff's July 2005 MRI results and the forms he completed for Plaintiff in pursuit of these benefits. (R. at 351, 631, 633-37.) While Drs. Mehta and Crane kept Dr. Simpson apprised of Plaintiff's progress, there is no evidence in the record to suggest that Plaintiff regularly consulted Dr. Simpson in-person during the course of his back-injury treatment. The Treating Physician's Rule, as Plaintiff readily acknowledges in his brief, is grounded in the notion that "any physician who treats an individual will always be in the best position to offer opinions about the nature and severity of the claimants medical problems and their consequent limitations." (Pl.'s Mem. at 10.) The fact that Dr. Simpson was not primarily

---

[24] Dr. Kundar treated Plaintiff's cardiovascular disease. Because Plaintiff concedes that his condition is stable and is not a material fact affecting his RFC assessment, Plaintiff's treatment history with Dr. Kundar is not relevant in determining the outcome of Plaintiff's case. *See supra* n.5.

responsible for the treatment of Plaintiff's back problems weighs against assigning his opinion controlling weight.

This fact notwithstanding, Dr. Simpson's opinion of Plaintiff's limitations contained in the Physical RFC Assessment form is inconsistent with the other medical evidence of record. His opinions regarding Plaintiff's standing, sitting, walking, and weight-lifting limitations are inconsistent with Plaintiff's own assessment of his limitations on the same form. (R. at 633-37.) Dr. Simpson indicated that Plaintiff could sit for thirty (30) minutes, stand for ten (10) minutes, and walk for ten (10) minutes continuously in an eight-hour workday without changing positions. (R. at 633.) Additionally, he found that Plaintiff could lift zero to five (0 – 5) pounds frequently and six to ten (6 – 10) pounds occasionally over the course of an eight-hour day. (R. at 633.) In contrast, Plaintiff did not believe he was so limited. He opined that he could sit for fifteen (15) minutes to one (1) hour continuously, stand for twenty (20) minutes continuously, and, lift seven (7) pounds occasionally and five (5) pounds frequently. (R. at 633-34.)

Dr. Simpson's opinion also conflicts with Plaintiff's report to Dr. Crane. In the same month that Dr. Simpson issued his opinion, Plaintiff was experiencing "substantial improvement," his mobility had improved, and he was taking less medication. (R. at 638.) Additionally, Dr. Simpson's assessment revealed that there was no impairment to Plaintiff's upper extremity strength and, that, while Plaintiff had an abnormal gait, he had only mild lower extremity weakness. (R. at 633-37.) Dr. Simpson also opined that Plaintiff could, with difficulty, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, carry out routine ambulatory activities such as shopping and banking, and climb a few steps at a reasonable pace with the use of a single hand rail. (R. at 633-37.) This opinion conflicts with Plaintiff's admitted daily activities. Plaintiff testified that he could take care of his

18

personal needs without assistance; help his wife with the shopping and cooking; read for three to four (3 – 4) hours at a time; visit his mother in a nursing home three (3) times a week; socialize with his family, neighbors and friends; drive a car twelve (12) miles four (4) times per week; and, occasionally operate a riding lawnmower. (R. at 38-40.) Thus, Plaintiff's own statements regarding his pain and admitted daily activities conflict with Dr. Simpson's opinion and support the conclusion that Plaintiff had an RFC for light work during the relevant period.

The records of Plaintiff's treating specialists — neurosurgeon Dr. Mehta and pain management specialist Dr. Crane — also conflict with Dr. Simpson's opinion that Plaintiff could perform sedentary work. These specialist opinions bolster the ALJ's conclusion that Plaintiff could perform light work with some limitations. Following Plaintiff's discectomy on September 27, 2005, Plaintiff reported significant improvement and had met his physical therapy goals by March 2006. (R. at 225-30, 249, 362-64.) He did not return to Dr. Mehta until over a year later, at which time he complained of right leg pain and back pain. (R. at 360.) Dr. Mehta ordered an MRI, but the MRI did not reveal anything that would have accounted for Plaintiff's symptoms. (R. at 357-58, 360.) Based on these findings, Dr. Mehta recommended "conservative treatment" and referred Plaintiff to Dr. Crane for pain management.[25] (R. at 356, 382-84.)

The record shows that Plaintiff's pain management treatment with Dr. Crane fluctuated over the relevant time period. (R. at 595, 652-55.) For example, in September 2008, Plaintiff reported "substantial improvement" since the ablation. (R. at 638.) This last report of "substantial improvement" is in direct conflict with Dr. Simpson's opinions recorded that very

---

[25] Plaintiff argues that the ALJ's characterization of his care as "conservative" represents only the ALJ's own "internal and idiosyncratic standard of which treatments would justify disability." Such an argument is without merit. Dr. Mehta's own notes state: "I will be reluctant to pursue at this stage and try *conservative* management for the next several months." (R. at 356 (emphasis added).)

same month in the Physical RFC Assessment form, in which Dr. Simpson opined that Plaintiff was incapable of performing sedentary work.[26]  (R. at 633-37.)

Finally, Dr. Constant's state agency assessment, conducted on October 10, 2007, also supports the ALJ's finding that Plaintiff was capable of performing light work.  (R. at 448-53.) After reviewing the evidence, Dr. Constant concluded that Plaintiff retained the capacity for light work as long as the work does not require climbing ladders, ropes, or scaffolds.  (R. at 449-50.) Dr. Constant opined that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (R. at 450.)  The ALJ weighed this opinion as that of a non-examining expert source, because Dr. Constant is a highly qualified physician who is also an expert in Social Security disability evaluation.  *See* 20 C.F.R. § 404.1527(e).  Accordingly, the ALJ gave the assessment "some, but not controlling" weight.  *See* 20 C.F.R. § 404.1527(c).

The other substantial evidence of record also conflicts with Dr. Simpson's opinion. Therefore, the ALJ did not err in assigning Plaintiff's treating physician's opinion less than controlling weight.  Also weighing against Dr. Simpson is the fact that he is a primary care physician, not a specialist.  The opinion of a specialist about medical issues related to his or her area of specialty may be given greater weight than the opinion of a source who is not a specialist. *See* 20 C.F.R. § 404.1527(c)(5).  Pursuant to these regulations, the ALJ properly gave Dr. Simpson's opinion less weight than he gave to those of treating specialists.

Furthermore, substantial evidence supports the ALJ's conclusion that Plaintiff is capable of performing light work.  As the ALJ noted, the treatment records indicate that Dr. Crane's

---

[26] In Defendant's Brief in Support of Its Motion for Summary Judgment, the Commissioner alleges that these forms were actually completed by Plaintiff's counsel, and not by Dr. Simpson, because they are not the official forms the agency asks medical sources to complete. (Def.'s Mem. at 8 n.2.)  However, in light of the overwhelming evidence that conflicts with Dr. Simpson's opinion, it is unnecessary at this point to determine the accuracy of this allegation.

conservative approach has resulted in an improvement in Plaintiff's level of pain and an increase in Plaintiff's mobility. (R. at 21.) Dr. Simpson's own treatment notes reflect findings of only mild lower extremity weakness and subjective complaints of lower back pain. (R. at 633-37.) While the Court acknowledges that Plaintiff still reports some pain, his increased mobility and decreased use of pain medication demonstrate that he is on the road to recovery. Accordingly, it is this Court's recommendation that the ALJ's conclusion regarding Dr. Simpson's opinion be affirmed.

**B.       The ALJ's credibility analysis is supported by substantial evidence.**

In evaluating the credibility of a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Id.* at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain, and the extent to which it affects the individual's ability to work. *Id.* at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Id.* at 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997); *see also Hancock v. Astrue*, 667 F.3d at 476 (citation omitted). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well-established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *See Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, although the ALJ found that Plaintiff's impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of such were not credible to the extent they were inconsistent with the given RFC. (R. at 20.) As noted earlier, the medical records did not substantiate the severity of Plaintiff's pain and symptoms. (R. at 20-21.) The objective medical evidence, together with the conservative nature of Plaintiff's treatment and his admitted activities of daily living, diminished his credibility regarding the frequency and severity of his symptoms. (R. at 21.) Thus, substantial evidence

also supports the ALJ's decision regarding Plaintiff's credibility. Accordingly, this Court recommends that the ALJ's credibility analysis be affirmed.

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion to remand (ECF No. 7) be DENIED; that Defendant's motion for summary judgment (ECF No. 12) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: April 4, 2012

23